```
                        UNITED STATES DISTRICT COURT
                                 FOR THE
                           DISTRICT OF VERMONT

UNITED STATES OF AMERICA,    )
                             )
          v.                 )    Case No. 2:23-cr-108-7
                             )
ZOQUIA BARBOSA               )
```

## OPINION AND ORDER

Pending before the Court is Defendant Zoquia Barbosa's motion to suppress evidence and request for a *Franks* hearing. Defendant submits that the law enforcement affidavit supporting a warrant to search her residence cited unreliable confidential source information, was stale, and lacked probable cause. The Government opposes the motion and the request for a hearing. For reasons set forth below, Defendant's motion is **denied**.

## Background

On October 4, 2023, ATF Special Agent Katrina Anderson applied for a search warrant to search Defendant's residence at 51 Wilbraham Avenue in Springfield, Massachusetts. Defendant is the biological mother of Linoshka Barbosa ("Linoshka"), a lead defendant in this case. United States Magistrate Judge Katherine A. Robertson authorized and issued the search warrant that same day.

The affidavit supporting the search warrant described a drug conspiracy involving firearms. The conspiracy began in or about the spring of 2020. Agent Anderson's affidavit relied on

a variety of information, including Facebook messages, a GPS tracker placed on a co-conspirator's car, and four different confidential sources.

The Facebook messages, obtained in December 2022 by means of a separate search warrant, allegedly provided information about Defendant's role in the conspiracy.  Specifically, the Facebook search revealed that on December 16, 2021, Defendant asked Linoshka for directions to an address in Brattleboro, Vermont, where co-conspirators were known to be selling drugs.  Agent Anderson believed that Defendant sought this information in order to assist in the drug conspiracy.  On May 11, 2022, Linoshka sent Defendant to a different address in Brattleboro, Vermont.  This address was also used by co-conspirators to sell drugs, and in April 2023 was the scene of a homicide involving a conspirator.  Agent Anderson believed that Linoshka sent her mother to that second address to assist with the conspiracy.

On April 16, 2022, Defendant sent Linoshka a picture of what appeared to be drug proceeds.  On April 24, 2022, Defendant sent Linoskha another message telling her that Linoshka had "20,500."  Earlier that month, Defendant had told Linoshka she would pay her "rent."  According to Agent Anderson, these messages indicated that Defendant had a role in helping to store and launder drug proceeds.

On July 23, 2022, Linoshka and Jeremy White exchanged messages regarding two pistols for sale at a cost of $2,500 each. Linoshka agreed to have her mother bring the money to White, and later that day asked Defendant to bring him "5,000." In response, Defendant responded "let me get home." Agent Anderson believed these messages indicated that Defendant planned to go to her residence to get money for the firearms, and that the money constituted proceeds from Linoshka's sale of drugs.

In December 2022, Linoshka sent Defendant a screenshot that appeared to show Linoshka had paid for a trip to Puerto Rico in the amount of $6,334.36. Linoshka also appeared to have directed Defendant to deposit $6,000 into a bank account. Agent Anderson believed these messages indicated Defendant's involvement in helping Linoshka launder drug proceeds.

In addition to the Facebook messages, the Government was in possession of information from a GPS device attached to a co-conspirator's car. That information was obtained by means of a separate warrant, and the co-conspirator is identified in Agent Anderson's affidavit as "CS2." CS2 was a Lyft driver. The evidence, according to the affidavit, showed that CS2 was hired to drive Linoshka and other co-conspirators between Hartford, Connecticut and Vermont; to pick up drugs in Hartford and transport them to Vermont; and to pick up drug proceeds and

3

transport them to different locations used by Linoshka. The GPS data also showed that CS2 stopped on Wilbraham Avenue in the vicinity of Defendant's Springfield, Massachusetts residence on at least two occasions.

The affidavit further relied upon statements from four confidential sources. Those included an ATF confidential informant ("ATF CI") who in December 2022 indicated that Linoshka and her associates were dealing fentanyl, cocaine, and crack cocaine from residences in the Brattleboro area. The ATF CI, corroborating the evidence from the GPS, reported that CS2 would drive the drugs from Connecticut and provide those drugs to Linoshka and her associates.

A second confidential source, identified in the affidavit as "CS1," provided information to law enforcement in May 2023 and again in September 2023. CS1 was a former member of the alleged crime organization and had helped the group distribute drugs in Brattleboro. CS1's information corroborated the information provided by the ATF CI, reporting that Linoshka and her associates would make two to three trips to Brattleboro each week with drugs. CS2's vehicle would be used to transport items in the trunk of his car. CS1 also reported that Linoshka kept drug proceeds at several locations, and that one such location was Linoshka's mother's residence.

4

CS1 met Defendant in the spring of 2020, and knew she was Linoshka's mother. CS1 reported that Defendant would come to Vermont at least once or twice a month, primarily to pick up drug proceeds and take the money home with her. The money used to purchase the drugs would go to Hartford with CS2, while the profits from the drug sales would go to Defendant's residence. CS1 also reported that Linoshka supported her mother with drug proceeds, and that the two had purchased a house in Puerto Rico with cash in early 2023.

A third informant ("CS2") spoke with law enforcement after a vehicle stop and arrest on June 12, 2023. CS2 was a member of Linoshka's alleged organization, and corroborated information provided by CS1 and the ATF CI. CS2 had reportedly been making regular trips to Vermont on behalf of Linoshka for the past two-and-a-half years. CS2 would meet with people in Hartford, and those people would place certain items in CS2's trunk for transport to Linoshka and her associates in Vermont. CS2 knew Linoshka's mother and believed s/he had picked up cash from Defendant in the past. When CS2 went to Defendant's Springfield residence, CS2 would pick up Linoshka and on one occasion received crack cocaine for CS2's own use.

The fourth confidential source ("CS3") was also a former member of the alleged drug organization. CS3 reported that after CS2's arrest in June 2023, the organization hired another

5

local person to drive for the group. In addition, Defendant would reportedly rent cars for the group and would courier both drugs and drug sale proceeds, bringing the money "back south." CS3 believed Defendant made at least five trips for the organization after CS2's arrest.

Defendant submits that the four confidential sources did not support a finding of probable cause. She notes that none of the sources: provided a photo identification of Defendant; provided the address or street of Defendant's residence; reported seeing drugs either in Defendant's possession or at her residence; or provided dates of alleged illegal activity occurring at the residence. Defendant also argues that the information in the affidavit was stale, and that the good faith exception does not apply. Finally, Defendant contends that the affidavit inaccurately reported certain information, including the number of times CS2 stopped in the vicinity of Defendant's home, and that such inaccuracies warrant a *Franks* hearing.

## Discussion

### I. Probable Cause

Probable cause for a search exists "where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (alteration in original). "The task of the issuing

magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ..., including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Probable cause does not require direct evidence, and may "be based on an accumulation of circumstantial evidence." *United States v. Harding*, 273 F. Supp. 2d 411, 417–18 (S.D.N.Y. 2003).  "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed."  *Gates*, 462 U.S. at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

"[W]hen [a] warrant is based upon information obtained through the use of a confidential informant, courts assess the information by examining the 'totality of circumstances' bearing upon its reliability." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (citing *Gates*, 462 U.S. at 230–31 and *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991)).  In assessing the totality of the circumstances, the Court evaluates "whether the information an informant provides is corroborated by independent police investigation, because an informant who is right about some facts is more likely to be right about others."

7

*United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) (citations omitted).

Here, Agent Anderson's affidavit cited information from a variety of sources, including confidential informants, Facebook messages, and GPS data. Those sources each offered evidence – oftentimes corroborating evidence – supporting the Magistrate Judge's finding of probable cause. The corroborating evidence of criminal activity was significant, particularly with respect to the organization's pattern of purchasing drugs in Connecticut and selling them in Vermont, with proceeds then held by Defendant. For example, the GPS data showed repeated trips by CS2 between Hartford, Connecticut and Brattleboro, Vermont. The ATF CI and CS2 both confirmed that CS2 had been making regular trips between Connecticut and Vermont, delivering drugs to the Brattleboro area. CS3 reported that after CS2 was arrested, s/he believed that Defendant rented cars for the organization and would courier proceeds from the drug sales "back south."

The GPS data also corroborated CS2's statement that s/he had been to Wilbraham Avenue in the direct vicinity of Defendant's home. CS2 stated that s/he had transported Linoshka from the residence, and on at least one occasion had received drugs. CS2 also believed that Defendant had picked up cash. Defendant's role in receiving and transporting cash was corroborated by CS1, who stated that Defendant kept drug

8

proceeds at her home, and at times came to Vermont to retrieve such proceeds. CS2 reported that Linoshka and Defendant had purchased a home in Puerto Rico, which was consistent with the Facebook evidence of suspected money laundering. The Facebook messages also suggested that cash held at Defendant's home was used to purchase weapons.

Viewed in the totality, and given the level of corroboration, the Court finds that Agent Anderson's affidavit provided a substantial basis to find probable cause. The informants offered consistent reports about the drug operation, thus enhancing their credibility. *See Gagnon*, 373 F.3d at 236. There were also multiple reports of the Defendant receiving drug proceeds, as well as evidence of those proceeds being kept at her home. The motion to suppress for lack of probable cause is denied.

## II. Staleness

Defendant argues that certain evidence cited in the affidavit was too old to be reliable and was therefore stale. "While there is no bright line rule for staleness, the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993)

(citations omitted).  The Second Circuit has identified a number of factors relevant to a staleness inquiry, including: "[t]he currency and specificity of the information forming the basis" for probable cause, "the reliability of the sources of information, the nature of the alleged illegal activity, the duration of that activity in the location in question, and the nature of the evidence being sought."  *United States v. McGrath*, 622 F.2d 36, 41–42 (2d Cir. 1980).

The Second Circuit has also allowed that "facts of past criminal activity that by themselves are too stale can be sufficient if the affidavit also establishes a pattern of criminal activity."  *Wagner*, 989 F.2d at 75.  "Narcotics conspiracies are the very paradigm of the continuing enterprises for which the courts have relaxed the temporal requirements of non-staleness."  *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990).  Indeed, in investigations of ongoing narcotics operations, "intervals of weeks or months between the last described act and the application for a warrant [do] not necessarily make the information stale."  *Rivera*, 928 F.2d at 602.

In this case, the affidavit in support of the October 2023 warrant referenced suspected criminal activity spanning from 2020 through to the summer of 2023.  The GPS data, which corroborated CS2's statements, was from April and May of 2023.

10

CS3 reported his/her belief that after CS2's arrest in June 2023, Defendant made several trips to Vermont. This information regarding couriers and the regular transfer of money was consistent with other evidence of an ongoing drug conspiracy. "Where, as here, the supporting affidavits present a picture of continuing conduct, as opposed to an isolated instance of wrongdoing, the passage of time between the last described act and the presentation of the application becomes less significant." *United States v. Gallo*, 863 F.2d 185, 191 (2d Cir. 1988) (cleaned up); *see also Rowell*, 903 F.2d at 903 (no staleness from eighteen-month delay between the informant's statement and a wiretap application in a narcotics conspiracy); *United States v. Gotti*, 42 F. Supp. 2d 252, 266 (S.D.N.Y. 1999) ("seemingly stale allegations can be revitalized by additional allegations containing current information indicating continuity of the alleged unusual activities"). Given the continuous nature of the narcotics conspiracy, including evidence showing the regular flow of drugs to Vermont and proceeds to Defendant through the summer of 2023, the Court finds that the showing of probable cause was not impaired by staleness.

### III. The Good Faith Exception

The government submits that even if the Court were to find a lack of probable cause, the good faith exception would preclude the suppression of evidence. The government is correct

11

that a warrant issued in "violation of the Fourth Amendment does not necessarily result in the application of the exclusionary rule." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010). In *United States v. Leon*, the Supreme Court recognized an exception to the exclusionary rule for "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." 468 U.S. at 922. The Court reasoned that, in those circumstances, "[p]enalizing the officer for the magistrate [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 921. "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance" on an invalidated warrant. *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992).

The Supreme Court has identified four circumstances where the good faith exception to the exclusionary rule applies:

> (1) where the issuing magistrate [judge] has been knowingly misled; (2) where the issuing magistrate [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Moore,* 968 F.2d 216, 222 (2d Cir. 1992) (citing *Leon*, 468 U.S. at 923). Here, as discussed more fully below, even assuming that misleading evidence about GPS data was included in the affidavit, excision of that evidence would still

12

result in a finding of probable cause.  With respect to Defendant's contention that the affidavit failed to disclose that another person in the conspiracy was referred to as "mommy," the government notes that although CS1 was sometimes called "ma" because of his/her age, there could be no confusing CS1 with Defendant.  CS1 reportedly housed Linoshka in Brattleboro for a period of time. Defendant is Linoshka's biological mother, lives in Massachusetts, and does not speak English.  Nothing in the evidence suggests any sort of confusion about Defendant's identity.

Nor is there evidence that the Magistrate Judge wholly abandoned her role.  Probable cause, supported by multiple corroborating statements, was not so lacking as to render reliance upon the warrant unreasonable.  Finally, the warrant was in no way facially deficient.  The Court therefore finds that, even if probable cause were lacking, the good faith exception would apply.

## IV.  A *Franks* Hearing

The Supreme Court held in *Franks v. Delaware* that a defendant may "challenge the veracity of a sworn statement used by police to procure a search warrant."  438 U.S. 154, 155 (1978).  *Franks* applies to "omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate."  *United States v. Awadallah*, 349

13

F.3d 42, 68 (2d Cir. 2003) (internal quotation marks and emphasis omitted). "[M]isstatements or omissions caused by 'negligence or innocent mistake[s]' do not warrant suppression." *United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013) (quoting *Franks*, 438 U.S. at 171). A court holds a *Franks* hearing only if "the defendant makes a substantial preliminary showing" that the standard has been satisfied, "and if the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155–56 (emphasis added).

Defendant argues that Agent Anderson did not accurately describe the GPS data. Specifically, Defendant focuses upon the statement in the affidavit that "CS2 appeared to travel to the area around [Defendant's residence] and made stops in Springfield, MA on March 27, 2023, April 14, 2023, April 22, 2023, May 9, 2023, May 11, 2023, or May 13, 2023." ECF No. 135 at 15. Defendant contends that this evidence is false, as the GPS data reportedly "does not show that CS2's vehicle made stops in Springfield, MA or near [Defendant's residence] on March 27, 2023, April 14, 2023, or April 22, 2023." *Id.* at 16. Defendant submits that her residence is "located just a couple miles off of I-91," and that CS2 would therefore have driven in "the area" several times a week while transporting drugs from Hartford to Brattleboro. *Id.* Defendant further argues that the misrepresentation was intentional, since the GPS data shows CS2

14

travelling at a rate that would make a stop in Springfield unfeasible.

The government concedes that the GPS data does not support the statements in the affidavit about May 11 and May 13. With respect to the three dates challenged by Defendant, the government has responded with exhibits that allegedly show CS2 stopping in Springfield on March 27, April 14, April 22, and May 9. Defendant notes in reply that the stops were in West Springfield, and not in the vicinity of the Wilbraham Avenue residence. The government also submits that, even if the Court were to excise the disputed dates from the affidavit, there would still be probable cause to issue the warrant.

As the government suggests, when deciding whether the alleged misrepresentations or omissions were necessary to the finding of probable cause, courts apply the "corrected affidavit" approach, which requires the Court to consider whether a hypothetical corrected affidavit would still establish probable cause even after any misstatements are excluded and any omitted information is included. *See Washington v. Napolitano*, 29 F.4th 93, 105 (2d Cir. 2022). "The ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *United States v. Canfield*, 212 F.3d 713, 718

(2d Cir. 2000) (quoting *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985)).

Defendant does not challenge two of the dates in question: April 3, 3023 and May 7, 2023.  For each date, the GPS data shows CS2 stopping in the immediate vicinity of Defendant's house.  Those stops corroborated CS2's later statements to law enforcement about making trips to Defendant's residence.  Together with the other evidence presented in the affidavit, the Court finds that these dates alone were sufficient to support a finding of probable cause.

## Conclusion

For the reasons set forth above, Defendant's motion to suppress (ECF No. 135) is **denied**.  The related motions to file under seal (ECF Nos. 136, 157) are **granted**.[1]

DATED at Burlington, in the District of Vermont, this 24th day of October, 2024.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge

---

[1] Defendant moved to seal the initial motion and attached exhibits, but did not move to seal her reply memorandum.  The government's response memorandum is also not sealed, although it requested that one of the two attached exhibits be sealed.  Given that much of the briefing on this matter is unsealed, the Court finds it unnecessary to seal this Opinion and Order.